```
             UNITED STATES DISTRICT COURT
              DISTRICT OF NEW HAMPSHIRE
```

Chao-Cheng Teng

    v.                                 Civil No. 09-cv-8-JL
                                        Opinion No. 2010 DNH 027
Town of Kensington, et al.


**MEMORANDUM ORDER**

    This civil rights case involves a series of disputes between a New Hampshire resident and local officials over voting rights, gun rights, and police protection. Plaintiff Chao-Cheng Teng, a naturalized citizen originally from China, brought suit under 42 U.S.C. § 1983 against the officials and their respective towns (Danville and Kensington) alleging violations of the Second, Fourteenth, and Fifteenth Amendments. Specifically, she claims that the defendants denied her the right to vote on account of her race, unreasonably denied her a license to carry a concealed handgun, and refused--also because of her race--to bring charges against a neighbor who allegedly assaulted her. This court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question).

    The defendants have moved for summary judgment on all claims, see Fed. R. Civ. P. 56, arguing that they had legitimate and non-discriminatory reasons for their actions. Although Teng has objected to the motions through her counsel, she has not

presented any evidence or case law to support her position.[1] Summary judgment is granted. The record shows that the defendants did not deny Teng the right to vote; they merely prevented her from voting twice on the same day and from causing a disturbance at the polling station. Nor did the defendants deny Teng the right to bear arms; they merely requested that she provide more background information to support her application for a license for concealed carrying. Finally, their refusal to prosecute her neighbor was based not on Teng's race, but rather on a lack of evidence.

## I. Applicable legal standard

Summary judgment is appropriate where "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this determination, the court "must scrutinize the record in the light most flattering to the party opposing the motion, indulging all reasonable inferences in that party's favor." Mulvihill v. Top-Flite Golf Co., 335 F.3d 15, 19 (1st Cir. 2003).

---

[1] The parties mutually declined this court's offer to hold oral argument, which is its ordinary practice for dispositive motions.

Where, as here, the non-moving party fails to submit any evidence to support her objection,[2] "[a]ll properly supported material facts in the moving party's factual statement shall be deemed admitted." L.R. 7.2(b)(2); see also DeJesus v. LTT Card Svcs., Inc., 474 F.3d 16, 20 (1st Cir. 2007). Summary judgment does not, however, "automatically follow." Stonkus v. City of Brockton Sch. Dep't, 322 F.3d 97, 102 (1st Cir. 2003). This court still must evaluate whether the defendants' submissions entitle them to judgment as a matter of law. See Fed. R. Civ. P. 56(e) ("If the adverse party does not . . . respond, summary judgment, if appropriate, shall be entered against the adverse party.") (emphasis added).

## II. Voting rights claims

First, Teng alleges that the two towns and their respective town moderators violated the Fourteenth and Fifteenth Amendments by denying her the right to vote because of her race. This court will (A) summarize the relevant facts and then (B) analyze Teng's claims on the merits. As explained below, the defendants did not deny Teng's right to vote. They merely prevented her from voting

---

[2]Teng purports to "stand on the assertions in her [amended] complaint," which is unsworn. But a party opposing summary judgment "may not rest upon mere allegations in . . . an unverified complaint or lawyer's brief." De la Vega v. San Juan Star, Inc., 377 F.3d 111, 118 n.9 (1st Cir. 2004).

3

in both the Republican and Democratic primary elections on the same day, which is prohibited by state law, and from causing a disturbance at the polling station during a general election. Neither is constitutionally protected activity.

**A.   Facts**

Teng went to the Kensington polling station in November 2004 to vote in the general election. After receiving her ballot, she asked the town moderator to explain a ballot question to her. The moderator explained what the question meant, but said he could not suggest how to answer it. Teng became upset and began arguing with the town clerk, using abusive language. The moderator suggested that she sit down, complete her ballot, and then leave the polling station. Teng responded by throwing her ballot on the table, redirecting her abusive language at the moderator, and putting the sharp end of her pencil near his face to make her point. The moderator repeatedly asked her to withdraw the pencil. Once she did, he asked her to leave the polling station if she was done voting. Teng walked out without casting her ballot.

In September 2008, after moving to nearby Danville, Teng went to that town's polling station to vote in the state primary election. As a registered independent, she wanted to vote for some Republican candidates and some Democratic candidates. But

the town moderator explained to her that she had to vote in either one party's primary or the other. Teng voted in the Republican primary, as confirmed by the official election checklist, and then left the voting area. She then tried to re-enter to vote in the Democratic primary. The town moderator denied her re-entry.

**B.  Analysis**

The Supreme Court has long recognized voting as a fundamental right under the Fourteenth Amendment.[3]  See, e.g., Reynolds v. Sims, 377 U.S. 533, 562 (1964) (citing Yick Wo v. Hopkins, 118 U.S. 356, 370 (1886)).  When the right is severely restricted, the Fourteenth Amendment requires that the restriction be "justified by a narrowly drawn state interest of compelling importance." Crawford v. Marion County Election Bd., 128 S. Ct. 1610, 1616 (2008) (citing Norman v. Reed, 502 U.S. 279, 288-89 (1992)).  And even when the restriction is less severe, it "must be justified by relevant and legitimate state interests sufficiently weighty to justify the limitation."  Id. No voting restriction based on race is ever justified, because

---

[3] See U.S. Const. amend. XIV ("No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.").

the Fifteenth Amendment expressly provides that the right to vote "shall not be denied or abridged . . . on account of race, color, or previous condition of servitude." U.S. Const. amend. XV; see also Rice v. Cayetano, 528 U.S. 495, 512 (2000).

Here, Teng cannot show that Kensington and its town moderator restricted her voting rights at all. The record indicates that Teng caused a disturbance at the Kensington polling station and that the moderator asked her, first, to sit down and complete her ballot, and second, to leave the polling station if she was done voting. He did not ask her to leave without voting, nor did he have her forcibly removed. Rather, it was Teng's own decision to leave without casting her ballot. She cannot hold the defendants liable for that self-inflicted harm. See, e.g., Hollander v. McCain, 566 F. Supp. 2d 63, 70 n.7 (D.N.H. 2008) (noting that "'self-inflicted' harm caused by the voter . . . does not amount to an infringement of the franchise right") (citing 1 Lawrence H. Tribe, American Constitutional Law § 13-24, at 1122-23 (2d ed. 1988), and Rosario v. Rockefeller, 410 U.S. 752 (1973)).

Moreover, even if the moderator's statements could be construed as restricting Teng's voting rights, such a restriction would survive strict scrutiny under the Fourteenth Amendment. The government has a compelling and non-discriminatory interest in the "avoidance of . . . disruption at polling places," Am.

Broad. Co. v. Blackwell, 479 F. Supp. 2d 719, 740 (S.D. Ohio 2006), and the moderator's statements were narrowly tailored to serve that interest.  He gave Teng fair warning and a reasonable opportunity to cease her disruptive behavior and cast her ballot in an orderly manner.  When she refused to do so, he was justified in suggesting that she leave the polling station.  Cf. Garionis v. Newton, 827 F.2d 306, 309 (8th Cir. 1987) (no constitutional violation where voter was forcibly removed from polling station for wearing political button); Cotz v. Mastroeni, 476 F. Supp. 2d 332, 366-67 (S.D.N.Y. 2007) (no constitutional violation where poll watcher was forcibly removed from polling station for "being disruptive").

And finally, even if Teng could show that Kensington and its moderator denied her the right to vote, she failed to bring her constitutional challenge in a timely manner.  The statute of limitations for a § 1983 claim "is that which the State [where the cause of action arose] provides for personal-injury torts." Wallace v. Kato, 549 U.S. 384, 387 (2007).  New Hampshire, where all of Teng's claims arose, has a three-year statute of limitations for personal actions.  See N.H. Rev. Stat. § 508:4; Gorelik v. Costin, 2008 DNH 217, 9 (applying that limitations period to a § 1983 action).  More than four years passed between the November 2004 voting incident and when Teng filed suit in

January 2009.[4] Teng has not articulated any reason why the limitations period should be tolled. Her voting rights claim against Kensington and its moderator must therefore be rejected as untimely, as well as on the merits.

Her voting rights claim against Danville and its moderator fares no better. The record shows that Teng attempted to vote in both the Republican and Democratic primary elections on the same day, which is contrary to state law. See N.H. Rev. Stat. § 659:14, I ("No person shall be permitted to vote in any more than one party primary during any primary election."). The moderator simply required her to choose between the two primary elections and, once she did, prevented her from voting a second time. While that may be a restriction on her right to vote, it is a legitimate and non-discriminatory one that the Supreme Court has repeatedly upheld against constitutional challenge. See Clingman v. Beaver, 544 U.S. 581, 595 (2005) (explaining that states "must be allowed to limit voters' ability to roam among parties' primaries")[5]; Rosario, 410 U.S. at 752; see also Hollander, 566

---

[4]In her amended complaint, Teng alleged that the Kensington voting incident occurred in November 2006. But the defendants have introduced evidence that it actually occurred in November 2004. Teng has not presented any evidence to the contrary. This court therefore accepts the defendants' date as admitted. See supra Part I.

[5]The Supreme Court noted in Clingman, in fact, that New Hampshire's semi-closed primary system is analogous to the one upheld as constitutional in that case. 544 U.S. at 586 n.1 (citing N.H. Rev. Stat. § 659:14).

F. Supp. 2d at 70 n.7 (citing Rosario). Indeed, Teng's objection appears not to dispute that summary judgment is appropriate on this claim.[6]

In sum, because the defendants have offered legitimate, non-discriminatory explanations for their actions, and because Teng has not presented any evidence suggestive of racial discrimination, this court grants summary judgment to the defendants on her voting rights claims under the Fourteenth and Fifteenth Amendments. In addition, this court rejects her claim against Kensington and its moderator as barred by the statute of limitations.

### III. **Gun rights claims**

Next, Teng alleges that the towns violated the Second Amendment by unreasonably denying her applications for a license to carry a concealed handgun. This court will again (A) summarize the facts and (B) analyze the merits. As explained below, the defendants did not deny Teng the right to keep and bear arms. They merely requested that she provide more background information to support her license applications, which she declined to do. Even if those requests went beyond the

---

[6]Document no. 25, ¶ 5.

9

requirements of state law, they did not violate the Second Amendment.

**A.  Facts**

In October 2004, Teng applied to the town of Kensington for a license to carry a concealed handgun, using a one-page application form approved by the state.  See N.H. Rev. Stat. § 159:6.  The police chief, who had been designated by the town to review such applications, denied Teng's application by letter less than two weeks later.  He explained that the town was "unable to accept this application" because it "is not an original, it is incomplete, and it is not dated."[7]  The police chief closed his letter by inviting Teng to contact him with any questions.  Teng never submitted another application to the town.  She attempted to renew her license request orally at some point in 2004 or 2005, but the town requires all applications to be submitted in writing on the state-approved form.[8]

---

[7] Teng had filled out most of the form, but omitted a few responses (e.g., she did not explain a prior arrest) and failed to provide an original signature certifying that her answers were true.  Also, the application appeared to have been completed six months before its submission.

[8] In her amended complaint, Teng claimed that she made the oral request in October 2006.  But that is inconsistent with the record, which indicates that she had moved to Danville by January 2006 and was still living at the same Danville address as of November 2008.  Teng has not offered any evidence to the contrary.  Thus, even construing the record in the light most

After moving to Danville, Teng applied in January 2006 for a license from that town to carry a concealed handgun. As part of the review process, Danville's police chief requested Teng's criminal history from the county sheriff's department, which advised him that she had been denied a similar license in Kensington. So he contacted the Kensington police chief and requested a copy of Teng's entire police file, which was about four inches thick and thus took longer than usual to review. After reviewing it, Danville's police chief sent Teng a letter in March 2006 asking if he could meet with her to discuss certain concerns. Teng never arranged such a meeting. The police chief took no further action on her application.

**B.  Analysis**

The parties have devoted much of their briefs to debating whether the defendants properly applied New Hampshire law in processing Teng's applications for a license to carry a concealed handgun. See N.H. Rev. Stat. § 159:6. That debate is misdirected, though, because Teng has not asserted any claims under New Hampshire law. Her only claim is that the defendants violated the Second Amendment, which is a question of federal

---

favorable to her, the oral request must have been made in 2004 or 2005.

law.[9]  As our court of appeals explained in a similar § 1983 case based on the Second Amendment, the plaintiff "simply has no <u>federal</u> right to demand that [the police chief] stay within the confines of state law in conducting background checks" for gun licensing and registration purposes.  Gardner v. Vespia, 252 F.3d 500, 503 (1st Cir. 2001) (emphasis in original).  The only question that matters here is whether the defendants' refusal to grant Teng a license to carry a concealed handgun--unless and until she provided more background information to support her applications--amounted to a denial of her Second Amendment rights.

   The Second Amendment provides in full:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  The Supreme Court recently held for the first time that this provision "guarantee[s] the individual right to possess and carry weapons in case of confrontation," such that a total ban on the possession of

---

[9]In her summary judgment objection, Teng also asserted for the first time "a violation of her Due Process rights."  But no such claim appears in her amended complaint, and she has not sought leave to amend the complaint a second time.  The claim is therefore untimely and waived.  Moreover, the record shows that, while Teng may not have liked their decisions, the defendants gave her due process.  Indeed, she really seems to be arguing that her applications should have been approved with <u>less</u> process.

handguns is unconstitutional.[10]  Dist. of Columbia v. Heller, 128 S. Ct. 2783, 2797 (U.S. 2008).  But the Court cautioned that the right is "not unlimited" and that nothing in Heller "should be taken to cast doubt" on various "longstanding" restrictions on gun possession, which are still "presumptively lawful."  Id. at 2816-17 & n.26.  These include, but are not limited to, (1) "prohibitions on carrying concealed weapons," (2) "prohibitions on the possession of firearms by felons and the mentally ill," (3) "laws forbidding the carrying of firearms in sensitive places," and (4) "conditions and qualifications on the commercial sale of arms."  Id.; see also United States v. Rene E., 583 F.3d 8, 15 (1st Cir. 2009).

The Supreme Court declined in Heller to establish a precise standard of review for Second Amendment claims, stating only that something more than rational-basis review is required and that a total ban on handguns could not pass muster "[u]nder any of the standards of scrutiny that we have applied to enumerated constitutional rights."  128 S. Ct. at 2817 & n.27.  The converse

---

[10] The Supreme Court is currently reviewing a case that asks whether the Second Amendment applies to state and local governments by way of the Fourteenth Amendment.  See McDonald v. City of Chicago, 130 S. Ct. 48 (2009) (granting certiorari to review Nat'l Rifle Ass'n of Am., Inc. v. City of Chicago, 567 F.3d 856 (7th Cir. 2009)).  This court need not express any opinion on that incorporation issue, because even assuming that the Second Amendment applies, the defendants still have not violated it.

is true here:  Teng's claim cannot succeed under any such standard.  The defendants did not ban her from possessing handguns, or even from carrying them.  They merely asked her to provide more background information for use in determining whether she was suitable for <u>concealed</u> carrying.[11]  Given that <u>Heller</u> refers to outright "prohibitions on carrying concealed weapons" as "presumptively lawful," <u>see</u> <u>id.</u> at 2816-17 & n.26, far lesser restrictions of the sort imposed here (i.e., requiring that Teng complete a one-page application and meet with the police chief to discuss it) clearly do not violate the Second Amendment.

As with her voting rights claim, Teng also failed to bring her Second Amendment claim against Kensington within the three-year statute of limitations.  <u>See</u> <u>supra</u> Part II.B (citing N.H. Rev. Stat. § 508:4).  The police chief denied her license application in October 2004, more than four years before she filed this lawsuit.  And while Teng alleges that she orally

---

[11]Although the New Hampshire statute calls it a license "to carry a loaded pistol or revolver," N.H. Rev. Stat. 159:6, without mentioning the word "concealed," the New Hampshire Supreme Court has repeatedly explained that the statute "requires individuals to obtain permits to carry loaded, <u>concealed</u> weapons."  <u>Garand v. Town of Exeter</u>, 159 N.H. 136, 141 (2009) (quoting <u>Bleiler v. Chief, Dover Police Dep't</u>, 155 N.H. 693, 696 (2007)) (emphasis added); <u>see also</u> <u>Conway v. King</u>, 718 F. Supp. 1059, 1061 (D.N.H. 1989) (calling it a "license to carry a concealed weapon").  In other words, the statute "does not prohibit carrying weapons; it merely regulates the manner of carrying them."  <u>Bleiler</u>, 155 N.H. at 700.

14

renewed the application at a later point, that too happened at least three years before she filed suit. See supra note 8. Teng's claim against Kensington must therefore be rejected as untimely, as well as on the merits.

## IV. Refusal-to-prosecute claim

Finally, Teng alleges that Danville and one of its police officers violated her Fourteenth Amendment rights by refusing, on account of her race, to bring criminal charges against a neighbor who allegedly assaulted her.[12]  As with Teng's other claims, this court will (A) summarize the facts and (B) analyze the merits. As explained below, the record shows that the officer declined to charge the neighbor with assault not because of Teng's race, but rather because of a lack of evidence to support her allegations, which an eyewitness refuted.

---

[12]As part of this claim, Teng also alleges that the defendants failed to protect her from criminal activity and failed to conduct an adequate investigation of the crime scene. There is no evidence in the record to support those allegations. Moreover, Teng has not cited any authority for the proposition that such failures violate the Fourteenth Amendment. See, e.g., Ramos-Pinero v. Puerto Rico, 453 F.3d 48, 53 & n.6 (1st Cir. 2006) ("failure to protect an individual against private violence generally does not constitute a violation" of the Fourteenth Amendment) (citing DeShaney v. Winnebago County Dep't of Soc. Svcs., 489 U.S. 189 (1989)).

**A.   Facts**

In June 2007, the Danville police department received a report of an altercation between Teng and one of her neighbors, Troy Barnes.  Officer Jason Pond went to the campground where they lived and spoke with both of them.  Barnes said that Teng had been yelling at him while he was outside raking his yard and that he told her to leave, using his garden hoe to point the way. Teng grabbed the hoe, he said, causing a struggle in which her cheek came into contact with a lit cigarette that he was smoking. He denied having any intent to burn her.

Teng told a very different story.  She said that Barnes had assaulted her with the hoe, burned her with his cigarette, and attempted to strangle her.  Although the officer did not see any visible marks on Teng's neck, he called for medical support and invited her to provide a written statement (which she declined to do).  The officer also spoke with a number of witnesses at the scene.  One of them saw Teng attempt to gain control of Barnes's hoe and believed that her contact with the cigarette was accidental.  Two others heard Teng yelling at Barnes and refusing to leave his yard despite repeated requests.  None of them could corroborate Teng's allegations.

Before leaving the scene, the officer told Teng and Barnes that both of them could be charged with simple assault for

engaging in "mutual combat." See N.H. Rev. Stat. § 631:2-a; State v. Place, 152 N.H. 225, 227-28 (2005). After reviewing the evidence and sharing it with the police chief, however, the officer determined that he did not have probable cause to bring assault charges against Barnes. He did, however, pursue a disorderly conduct charge against Teng. The county prosecutor later decided to drop the charge.[13]

**B. Analysis**

"Prosecutorial discretion is a hallmark of the criminal justice system." United States v. Welch, 15 F.3d 1202, 1207 (1st Cir. 1993). The Supreme Court has made clear that law enforcement officers have "broad discretion" in deciding whom to charge with crimes and what crimes to charge. Wayte v. United States, 470 U.S. 598, 607 (1985). But that discretion is not entirely "unfettered." Id. at 608. The decision of whether to prosecute "may not be 'deliberately based upon an unjustifiable standard such as race, religion, or other arbitrary classification.'" Id. (quoting Bordenkircher v. Hayes, 434 U.S. 357, 364 (1978)). Such discrimination violates the Equal

---

[13] Teng has not challenged (or even mentioned) the disorderly conduct charge in her amended complaint or summary judgment objections. She focuses instead on the refusal to charge Barnes. This court does the same.

Protection Clause of the Fourteenth Amendment.  See U.S. Const. XIV ("nor [shall any State] deny to any person within its jurisdiction the equal protection of the laws").

To establish a selective prosecution claim based on race, Teng would need to present "clear evidence" of both discriminatory intent and effect.[14]  United States v. Lewis, 517 F.3d 20, 25 (1st Cir. 2008) (citing United States v. Armstrong, 517 U.S. 456, 465 (1996)).  As to intent, the evidence must show that the defendants decided not to prosecute her neighbor "at least in part because of, not merely in spite of," race.  Id. (quoting Wayte, 470 U.S. at 610).  There is a "formidable" presumption in such cases that the police acted with "regularity," which includes good faith, in making their decision.  Id.  As to effect, the evidence must show that

---

[14] Although the defendants do not challenge it, Teng's standing to bring this claim is questionable.  The Supreme Court has said many times that "a private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."  Town of Castle Rock v. Gonzales, 545 U.S. 748, 767 n.13 (2005) (quoting Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973)).  In keeping with that principle, "courts have generally declined to recognize standing on the part of victims of crimes to bring a § 1983 action based upon the lack of prosecution of others," Fulson v. City of Columbus, 801 F. Supp. 1, 6 (S.D. Ohio 1992), "even when the failure to prosecute was allegedly discriminatory."  Parkhurst v. Tabor, 569 F.3d 861, 866 (8th Cir. 2009) (citing United States v. Grundhoefer, 916 F.2d 788, 791 (2d Cir. 1990), and Sattler v. Johnson, 857 F.2d 224, 227 (4th Cir. 1988)).  But because the defendants have not argued that Teng lacks standing, and because her claim fails on the merits anyway, this court expresses no opinion on that issue.

similarly situated individuals of a different race were treated differently.  Id.

Here, Teng has not presented any evidence of discriminatory intent or effect, much less the type of "clear evidence" that would be required at trial.  The only evidence in the record is that the Danville police declined to charge Teng's neighbor with assault because eyewitness accounts tended to corroborate the neighbor's allegation that Teng had been the aggressor and that he had no intent to harm her.  None of the witnesses could corroborate Teng's allegations to the contrary.  Whether the neighbor and witnesses were telling the truth is not the issue here.  The issue is whether the police had a non-discriminatory reason for declining to prosecute Teng's neighbor.  And everything in the record suggests that they had the quintessential reason for such decisions:  a weak case. See Wayte, 470 U.S. at 607 (noting that "the strength of the case" is a legitimate factor to consider in deciding whether to prosecute); United States v. Magana, 127 F.3d 1, 9 (1st Cir. 1997) (same).  Indeed, Teng's objection raises little, if any, dispute on this claim.[15]  Summary judgment is therefore appropriate.

---

[15] Document no. 25, ¶ 5.

## V. Conclusion

For the reasons set forth above, the defendants' motions for summary judgment[16] are GRANTED. The clerk shall enter judgment accordingly and close the case.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated: February 17, 2010

cc: Richard C. Mooney, Esq.
    C. Matthew Cairns, Esq.
    Beth A. Deragon, Esq.
    William G. Scott, Esq.

---

[16] Documents no. 20 and 22.